COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-026-CV
 
 
 
IN 
THE INTEREST OF J.P.B., A CHILD
  
  
  
------------
 
FROM 
THE 16TH DISTRICT COURT OF DENTON COUNTY
 
------------
 
MEMORANDUM OPINION1#1
 
------------
        This 
is a termination of parental rights appeal.  Following a jury trial in 
November 2003, the trial court terminated the parental rights of Appellants 
Lonnie B. and Esmeralda B. in their twenty-month old son, J.P.B.[2] In three issues, Esmeralda argues: 1) the evidence is 
legally and factually insufficient to support termination of her parental 
rights; 2) the trial court improperly admitted x-ray prints into evidence; and 
3) she was denied effective assistance of counsel at trial.  In one issue, 
Lonnie contends that the evidence is legally and factually insufficient to show 
that he knowingly placed J.P.B. in an environment which endangered the child’s 
physical or emotional well-being, or knowingly allowed J.P.B to remain in such 
an environment.  He also argues that termination of his parental rights is 
not in the best interest of J.P.B.  We affirm the trial court’s judgment 
terminating the parental rights of Esmeralda B.  We reverse that portion of 
the trial court’s judgment terminating the parental rights of Lonnie B., and 
render judgment that the Texas Department of Protective and Regulatory Services 
(TDPRS)[3] take nothing on its claim seeking to 
terminate the parental rights of Lonnie B. to his son J.P.B.
Background
        Lonnie 
and Esmeralda are married.  Lonnie is J.P.B.‘s father and Esmeralda is 
J.P.B.’s mother. After a difficult and complicated pregnancy, J.P.B. was born 
on April 25, 2002, seven weeks prematurely by caesarean section.  J.P.B. 
remained in the hospital until he was released to his parents on May 21, 
2002.  Esmeralda stayed home to care for J.P.B. while Lonnie worked Monday 
through Friday from 11:30 a.m. until approximately 8:30 p.m. and every other 
Saturday.  Esmeralda cared for J.P.B. the majority of the time without help 
from anyone besides Lonnie, even though she had a difficult time recovering from 
her caesarean section.
        On 
May 23, 2002, Lonnie took J.P.B. to PediPlace for his first check-up.[4]  Dr. Fitzgerald and the nurses examined the infant 
but did not express any serious concerns regarding the child’s health.  
Eight days later, because J.P.B. cried continuously, Lonnie took J.P.B. back for 
another check-up.  He was examined again by Dr. Fitzgerald, who said the 
infant had thrush[5] and prescribed an antibiotic for 
treatment.  In mid-June Lonnie took J.P.B. to Cook Children’s Medical 
Center where Dr. Torres examined the child; no health concerns or abnormalities 
were identified.  Then on June 28, Lonnie took J.P.B. back to PediPlace to 
receive his routine immunization shots.  Lonnie told the doctor that he was 
concerned about J.P.B. because he would cry and become fussy after eating.  
The doctor examined J.P.B. at that time and did not make any other diagnosis 
besides thrush.  On July 1, 2002, Lonnie took J.P.B. to Trinity Medical 
Center (Trinity) because J.P.B. continued to cry and was constipated, and Lonnie 
was concerned because he noticed the child’s leg was swollen.  X-rays 
were taken at that time, but J.P.B. was only treated for colic, and Lonnie and 
J.P.B. were sent home.  Thereafter, on July 7, 2002, Lonnie took J.P.B. 
back to Trinity because the child continued to be irritable and fussy, and his 
leg continued to swell.  J.P.B. was admitted into the hospital and remained 
there until July 12, 2002.  Dr. Farah Naz was J.P.B.’s treating physician 
at Trinity; her initial diagnosis of the swelling was a secondary 
infection.  A bone scan and ultrasound were performed during J.P.B.’s 
stay at Trinity; the results of both tests were normal; however, Dr. Naz did 
testify that the ultrasound showed inflammation in the muscle.  During 
J.P.B.’s stay at Trinity, he was examined by other doctors, and various 
diagnoses were made and treatments recommended.  At no time during the 
child’s hospital stay did any of the physicians or staff suggest to Lonnie 
that J.P.B. might have been abused.
        On 
July 12, 2002, J.P.B. was transferred to Children’s Medical Center 
(Children’s) to have an MRI.  Children’s performed a spinal tap instead 
of an MRI.  The child was discharged on July 15, 2002 with a diagnosis of 
myositis (muscle inflammation).  After J.P.B.’s release from 
Children’s, Lonnie immediately scheduled another appointment with Dr. Naz.  
Finally, on July 19, 2002, a skeletal survey was taken of J.P.B.  It 
revealed multiple fractures ranging from seven days to four weeks old.  
After Lonnie was informed about his son’s fractures, the child was removed 
from his and his wife’s care.
Procedural 
History
        On 
July 22, 2002, TDPRS filed a petition for the termination of the parent-child 
relationship between J.P.B. and Lonnie and Esmeralda.  Following a jury 
trial, the trial judge terminated Lonnie and Esmeralda’s parental rights.
Burden of Proof 
in Termination Proceedings
        A 
parent’s rights to “the companionship, care, custody, and management” of 
his or her children are constitutional interests “far more precious than any 
property right.”  Santosky v. Kramer, 455 U.S. 745, 758-59, 102 S. 
Ct. 1388, 1397 (1982).  “While parental rights are of constitutional 
magnitude, they are not absolute.  Just as it is imperative for courts to 
recognize the constitutional underpinnings of the parent-child relationship, it 
is also essential that emotional and physical interests of the child not be 
sacrificed merely to preserve that right.”  In re C.H., 89 S.W.3d 
17, 26 (Tex. 2002).
        In 
a termination case, the State seeks not just to limit parental rights but to end 
them permanently — to divest the parent and child of all legal rights, 
privileges, duties, and powers normally existing between them, except for the 
child’s right to inherit.  Tex. 
Fam. Code Ann. § 161.206(b) (Vernon Supp. 2004-05); Holick v. Smith, 
685 S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination 
proceedings and strictly construe involuntary termination statutes in favor of 
the parent.  Holick, 685 S.W.2d at 20-21; In re D.T., 34 
S.W.3d 625, 630 (Tex. App.—Fort Worth 2000, pet. denied) (op. on reh’g).
        Termination 
of parental rights is a drastic remedy and is of such weight and gravity that 
due process requires the petitioner to justify termination by clear and 
convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 
161.206(a); In re G.M., 596 S.W.2d 846, 847 (Tex. 1980).  This 
intermediate standard falls between the preponderance standard of ordinary civil 
proceedings and the reasonable doubt standard of criminal proceedings.  G.M., 
596 S.W.2d at 847; D.T., 34 S.W.3d at 630.  It is defined as the 
“measure or degree of proof that will produce in the mind of the trier of fact 
a firm belief or conviction as to the truth of the allegations sought to be 
established.” Tex. Fam. Code Ann. § 101.007 (Vernon 
2002).
Standard of 
Review
        The 
higher burden of proof in termination cases alters the appellate standard of 
legal sufficiency review. In re J.F.C., 96 S.W.3d 256, 265 (Tex. 
2002).  The traditional no-evidence standard does not adequately protect 
the parents’ constitutional interests.  Id.  In reviewing the 
evidence for legal sufficiency in parental termination cases, we must determine 
“whether the evidence is such that a factfinder could reasonably form a firm 
belief or conviction” that the grounds for termination were proven.  Id. 
at 265-66.  We must review all the evidence in the light most favorable to 
the finding and judgment.  Id. at 266.  This means that we must 
assume that the factfinder resolved any disputed facts in favor of its finding 
if a reasonable factfinder could have done so.  Id. We must also 
disregard all evidence that a reasonable factfinder could have 
disbelieved.  Id.  We must consider, however, undisputed 
evidence even if it does not support the finding.  Id.  If we 
determine that no reasonable factfinder could form a firm belief or conviction 
that the grounds for termination were proven, then the evidence is legally 
insufficient, and we must render judgment for the parent.  Id.
        The 
higher burden of proof in termination cases also alters the appellate standard 
of factual sufficiency review.  In re C.H., 89 S.W.3d 17, 25 (Tex. 
2002).  “[A] finding that must be based on clear and convincing evidence 
cannot be viewed on appeal the same as one that may be sustained on a mere 
preponderance.”  Id.  In considering whether the evidence of 
termination rises to the level of being clear and convincing, we must determine 
“whether the evidence is such that a factfinder could reasonably form a firm 
belief or conviction” that the grounds for termination were proven.  Id.  
Our inquiry here is whether, on the entire record, a factfinder could reasonably 
form a firm conviction or belief that the parents violated one of the conduct 
provisions of section 161.001(1) and that the termination of the parents’ 
parental rights would be in the best interest of the child.  Id. at 
28.
        Because 
the facts are different for each Appellant, we will address their issues 
separately.
Esmeralda’s 
Issues on Appeal
        Esmeralda 
argues in three issues that: 1) the evidence is legally and factually 
insufficient to support the verdict in this case; 2) the trial court abused its 
discretion when it improperly admitted x-rays into evidence; and 3) she was 
denied effective assistance of counsel at trial.
        In 
a jury trial, a legal sufficiency issue must be preserved through one of the 
following procedural steps in the trial court: (1) a motion for instructed 
verdict; (2) a motion for judgment notwithstanding the verdict; (3) an objection 
to the submission of the question to the jury; (4) a motion to disregard the 
jury's answer to a vital fact question; or (5) a motion for new trial.  T.O. 
Stanley Boot Co. v. Bank of El Paso, 847 S.W.2d 218, 220-21 (Tex. 1992); Salinas 
v. Fort Worth Cab & Baggage Co., 725 S.W.2d 701, 704 (Tex. 1987); see 
generally William Powers, Jr. & Jack Ratliff, Another Look at 
"No Evidence" and "Insufficient Evidence," 69 Tex. L. Rev. 515, 530 (1991).  A 
review of the record reveals that Esmeralda did not preserve her legal 
sufficiency issue for appellate review; therefore, it is waived.
        In 
her second issue, Esmeralda argues that TDPRS failed to lay the proper predicate 
for the x-rays introduced at trial through Dr. Eugene Sheffield.  She also 
argues that the trial court abused its discretion when it admitted the x-rays 
into evidence over her objection and denied her motion for mistrial.
        “The 
admissibility of evidence is within the discretion of the trial court and will 
not be overturned absent an abuse of discretion.”  Moses v. State, 
105 S.W.3d 622, 627 (Tex. Crim. App. 2003).  The appellate court should 
affirm the trial court as long as the ruling is within the zone of reasonable 
disagreement.  Id.  The Texas Supreme Court has held that 
hospital records showing the results of a test are admissible under the Business 
Records Act, and that any gaps in the chain of custody go to the weight to be 
given to the testimony, rather than to its admissibility.  Missouri-Kansas-Texas 
R.R. Co. v. May, 600 S.W.2d 755, 756 (Tex. 1980).
        In 
the instant case, the x-rays in question were taken at Children’s, which now 
uses film-less images that are viewed on computer monitors.  Dr. Sheffield 
testified that he is a specialist at Children’s in the area of interpretation 
of pediatric imaging studies.  He also testified that he was the 
radiologist who evaluated J.P.B.’s images and that they were done 
properly.  He testified that the images taken had J.P.B.’s name on them, 
the date on the images was July 7, 2002, the positioning was appropriate, and 
that the technique was adequate for diagnosis.  Esmeralda’s counsel took 
Dr. Sheffield on voir dire during the trial, at which time he revealed that he 
was not present when the images were taken, had never operated the equipment it 
was taken with, did not know who had taken the image, and had never personally 
seen J.P.B.  The trial court admitted the x-rays over Esmeralda’s 
objection.
        Furthermore, 
the next day, out of the presence of the jury, Esmeralda made a motion for 
mistrial and a motion to strike the admitted x-rays because no proper predicate 
had been laid.  After additional examination of Dr. Sheffield regarding the 
procedure used in taking a patient from the emergency room to radiology to 
obtain an x-ray, the trial court denied the motion for mistrial and motion to 
strike.  Dr. Sheffield did not personally take the x-rays, could not 
testify as to who did take them, and did not personally examine J.P.B.  
However, based on his experience and expertise in this area, Dr. Sheffield was 
able to testify about the images contained in the x-rays.  We hold that any 
gaps in the chain of custody go to the weight of the evidence and not its 
admissibility.  See May, 600 S.W.2d at 756.  We overrule 
Esmeralda’s second issue.
        In 
her third issue, Esmeralda complains that the trial court caused her to suffer 
involuntary ineffective assistance of counsel by appointing counsel less than 
thirty days before trial.  Esmeralda and Lonnie hired a criminal law 
attorney three days after the removal of J.P.B. Later, upon that attorney’s 
recommendation, they hired a family law attorney.  On May 23, 2003, a 
motion for substitution of counsel was filed by Lonnie and Esmeralda, and the 
trial court approved the substitution of the new attorney.  On June 10, 
2003, Lonnie and Esmeralda filed a motion for continuance.  On August 8, 
2003, the attorney filed a motion for withdrawal of counsel as to Esmeralda 
only, and she consented to the motion.  On October 22, 2003, the court 
found Esmeralda indigent and appointed her counsel.  On October 30, 2003, 
Esmeralda’s appointed counsel filed a motion for continuance; however, the 
record contains no testimony from that hearing.  On November 17, 2003, at 
the pretrial hearing immediately preceding the trial on the merits, 
Esmeralda’s counsel announced not ready, stating that his earlier request for 
a continuance had been denied and that he had not been given an adequate amount 
of time to prepare.
        There 
is a right to effective assistance of counsel in termination cases.  In 
re M.S., 115 S.W.3d 534, 544 (Tex. 2003).  We review ineffective 
assistance of counsel claims under the Strickland two-pronged test.  
Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 
(1984); Thompson v. State, 9 S.W.3d 808, 812 (Tex. Crim. App. 
1999).  First, Esmeralda must show that her counsel's performance was 
deficient; second, she must show the deficient performance prejudiced the 
defense.  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.
        In 
evaluating the effectiveness of counsel under the first prong, we look to the 
totality of the representation and the particular circumstances of each 
case.  Thompson, 9 S.W.3d at 813.  The issue is whether 
counsel's assistance was reasonable under all the circumstances and prevailing 
professional norms at the time of the alleged error.  See Strickland, 
466 U.S. at 688-89, 104 S. Ct. at 2065.  “[C]ounsel is strongly presumed 
to have rendered adequate assistance and made all significant decisions in the 
exercise of reasonable professional judgment.”  Id. at 690, 104 S. 
Ct. at 2066.  An allegation of ineffective assistance must be firmly 
founded in the record, and the record must affirmatively demonstrate the alleged 
ineffectiveness.  Thompson, 9 S.W.3d at 813. Our scrutiny of 
counsel's performance must be highly deferential, and every effort must be made 
to eliminate the distorting effects of hindsight.  Strickland, 466 
U.S. at 689, 104 S. Ct. at 2065.
        In 
her brief argument, Esmeralda contends that the first prong of Strickland 
is met.  Because of the short notice to her counsel, she claims that he was 
unable to conduct binding discovery, or his own independent investigation into 
the medical issues involved, or obtain approval for payment for a defense expert 
to rebut the government’s expert.  Esmeralda does not complain of the 
trial court’s denial of her counsel’s motion for continuance.  We 
disagree that the first prong of Strickland has been met.
        There 
is nothing in the record to show what counsel would have discovered or to what a 
defense expert would have testified that would have aided in Esmeralda’s 
defense.  See Passmore v. State, 617 S.W.2d 682, 685 (Tex. Crim. 
App. [Panel Op.] 1981), overruled on other grounds by Reed v. State, 744 
S.W.2d 112, 115 (Tex. Crim. App. 1988).  Moreover, the record in this case 
is replete with evidence of counsel’s effective representation.  The 
record clearly demonstrates that counsel filed pretrial motions, actively 
participated in the voir dire of venire members, made an opening statement, 
objected to testimony and cross-examined witnesses, proposed a jury charge, and 
gave a closing argument.  Accordingly, there is no evidence to establish 
Esmeralda’s claim that the trial court caused her to suffer involuntary 
ineffective assistance of counsel by appointing her most recent counsel 
twenty-six days before trial.  Esmeralda’s third issue is overruled.
Grounds for 
Termination of Esmeralda’s Parental Rights
        The 
jury found that Esmeralda violated two provisions of the family code dealing 
with endangerment of a child.  See Tex. Fam. Code Ann. § 161.001(1)(D), 
(E).  Esmeralda challenges the legal and factual sufficiency of the 
evidence to support both these grounds for the termination of her parental 
rights.
Jury Trial
        As 
previously noted, this case was tried to a jury rather than to the bench.  
Esmeralda argues that there is insufficient evidence to support the jury’s 
finding that she engaged in conduct that endangered the physical or emotional 
well-being of J.P.B. Rule 324(b) requires that a complaint of factual 
insufficiency of the evidence to support a jury finding be raised in a motion 
for new trial.  Tex. R. Civ. P. 
324(b); Cecil v. Smith, 804 S.W.2d 509, 510 (Tex. 1991).  Generally, 
because no motion for new trial was filed, the error would be waived.  
However, a recent Texas Supreme Court decision addressed appellate review of 
factual sufficiency claims through “the due process prism.”  M.S., 
115 S.W.3d at 547.  In M.S., the Supreme Court did not expressly 
hold that the procedural rule of filing a motion for new trial should be set 
aside, but did suggest that balancing of the “Eldridge factors[6] could require a court of appeals to review an unpreserved 
complaint of error to ensure that our procedures comport with due 
process.”  Id. at 546.  In light of this recent case, we will 
address Esmeralda’s complaint of factual insufficiency.
Texas Family 
Code Section 161.001(1)(E)
        Under 
section 161.001(1)(E) of the Texas Family Code, Esmeralda’s parental rights 
may be terminated if the trial court found by clear and convincing evidence that 
she “engaged in conduct or knowingly placed the child with persons who engaged 
in conduct which endangers the physical or emotional well-being of the 
child.”  Tex. Fam. Code Ann. § 
161.001(1)(E).  Under this section, the term "endanger" means to 
expose to loss or injury; to jeopardize. In re M.C., 917 S.W.2d 268, 269 
(Tex. 1996).  There must be evidence of endangerment to the child's 
physical or emotional well-being as the direct result of the parent's 
conduct.  In re R.D., 955 S.W.2d 364, 367-68 (Tex. App.—San 
Antonio 1997, pet. denied).  Subsection (E) requires a "course of 
conduct."  Id.  Accordingly, when analyzing a jury’s 
findings pursuant to subsection (E), we must determine whether sufficient 
evidence exists that the endangerment of the child’s physical well-being was 
the direct result of the parent’s conduct, including acts, omissions, or 
failures to act.  In re D.M., 58 S.W.3d 801, 811-12 (Tex. 
App.—Fort Worth 2001, no pet.).  Termination under section 161.001(1)(E) 
must be based on more than a single act or omission; a voluntary, deliberate, 
and conscious course of conduct by the parent is required.  Tex. Fam. Code Ann. § 161.001(1)(E); D.T., 
34 S.W.3d at 634; In re K.M.M., 993 S.W.2d 225, 228 (Tex. App.—Eastland 
1999, no pet.).
        The 
record supports the conclusion that J.P.B. suffered multiple fractures.  
Dr. Thomas Abramo, who treated J.P.B. on July 19, 2002, testified that the child 
suffered fractures to his ribs, arms, and legs, and that these fractures were at 
various stages of healing.  Dr. Abramo stated that J.P.B.’s leg fractures 
were likely caused by yanking the child’s leg, or picking the child up by the 
thigh or femur, or the child being flung and thrown against something.  Dr. 
Abramo testified about two possible theories as to how J.P.B.’s rib fractures 
occurred.  He stated that they were either caused by a direct fist blow, or 
by grabbing the child around the chest and squeezing inward.  Dr. Abramo 
explained that premature babies, such as J.P.B., are at a higher risk for child 
abuse because they require more care, and it was his opinion that J.P.B. had 
been battered on multiple occasions.  The State points to Dr. Mark 
Foster’s psychological evaluation regarding Esmeralda’s ability to care for 
J.P.B.  His report contained the following:
   
[Mother]’s responses are like those of individuals who are described as 
immature, narcissistic, and self-indulgent.  She tends to make excessive 
demands on others for attention and sympathy.  However, she is probably 
resentful when even the most mild demands are made on her by others.  She 
is likely to have difficulty getting along with others in social 
situations.  [Mother] is probably suspicious of others and is [sic] 
probably results in her having difficulty establishing deep emotional ties with 
others.
 
[Mother] may have difficulty maintaining employment.  Her romantic 
relationships are probably characterized as having frequent conflicts.  
[Mother] is likely to have difficulty managing her emotions particularly 
anger.  Others may describe her as irritable, sullen, and 
argumentative.  Conflict with authority figures is common among persons 
responding in the manner to [Mother] did [sic].  Her anger toward authority 
figures may be expressed in open criticism.
  

[Mother] 
tends to deny serious psychological problems.  She may rationalize her 
behavior and transfer blame for her actions on to others.  She will 
probably have a good deal of difficulty in accepting responsibility for her own 
behavior.  She [sic] probably unrealistic and grandiose in her 
self-appraisal.  Because of her tendency to deny serious emotional problems 
[Mother] is unlikely to be receptive to traditional counseling or psychotherapy.
 
Dr. 
Foster testified that Esmeralda’s most overriding personality trait was lack 
of maturity and a high level of self-centeredness.  He said that she would 
be unlikely to face her problems and that she has a strong tendency towards 
narcissism.  Specifically, Dr. Foster explained that one who is 
narcissistic has a level beyond what is considered normal of self-focus or 
self-centeredness.  He stated that narcissistic people have a difficult 
time taking responsibility for their choices and actions.  Regarding 
J.P.B., Dr. Foster testified that Esmeralda’s anger may come from having an 
unrealistic expectation and becoming irritated more easily.  Because J.P.B. 
was extremely fussy, and cried continuously, Dr. Foster testified that he would 
be very concerned about Esmeralda’s ability to not let anger affect her 
relationship with J.P.B.  Furthermore, he stated that her tendency towards 
narcissism would affect her ability to be an effective and good parent because 
it would affect her ability to anticipate and be sensitive to the needs of 
J.P.B.
        Dr. 
Sheffield, a pediatric radiology specialist at Children’s, also testified that 
J.P.B. suffered numerous fractures.  He stated that J.P.B. had sustained 
approximately twenty-one fractures to his ribs, arms, and legs.  
Furthermore, he testified that all of these fractures were at various stages of 
healing and highly specified for a battered child.  Dr. Sheffield testified 
that he had no doubt that J.P.B. had been physically abused.
        Esmeralda 
testified that she was the primary caretaker of J.P.B. and that there was never 
anyone else left alone with him.  In fact, she repeatedly testified that 
she and her husband were the only two people who had continuous access to 
J.P.B.  She acknowledged that Lonnie was rarely alone with J.P.B. because 
she did not drive and whenever she left the house, Lonnie would drive.  She 
stated that J.P.B. constantly cried the first six weeks he was home, but that it 
never crossed her mind to make a doctor’s appointment to determine if 
something was wrong with the child.
        Esmeralda 
testified that she believed different medical staff at various times were 
responsible for J.P.B.’s injuries.  Specifically, she stated that doctors 
at Children’s or Trinity were responsible because when the doctors would 
examine the child they would pick him up, pull his leg, or pull his arm to see 
what was wrong with him.  During the trial, she maintained this theory 
despite her testimony that she and her husband spent every night at the hospital 
during J.P.B.’s stay and that she never saw any of the medical staff mistreat 
the child.  However, when Dr. Sheffield testified, he excluded the 
possibility of J.P.B.’s injuries occurring in the way Esmeralda 
described.  In fact, he testified that it would take a significant amount 
of force to injure a child in this manner.
        In 
summary, the evidence is undisputed that Esmeralda was J.P.B.’s primary 
caretaker, and she admitted that except for medical professionals, no one else 
was ever alone with him.  Lonnie, not Esmeralda, initiated the visits to 
the doctors or hospitals.  Esmeralda contended that J.P.B.’s twenty-one 
bone fractures were actually caused by the doctors and nurses who examined 
J.P.B.  However, Dr. Sheffield testified that there was no possible way 
J.P.B.’s injuries could have been caused by a medical exam—much more force 
would have been required to cause bone fractures.  J.P.B. was born seven 
weeks early and Dr. Abramo testified that premature babies are at a higher risk 
for child abuse because they require more care.  Applying the appropriate 
standards of review, we hold that the evidence is such that the jury could 
reasonably form a firm belief or conviction that Esmeralda knowingly engaged in 
conduct which endangered J.P.B.’s physical or emotional well-being.  
Consequently, we hold that there is legally and factually sufficient evidence to 
support termination of Esmeralda’s parental rights based upon that 
ground.  If multiple conduct grounds are alleged for termination, the 
evidence is sufficient if it supports just one of the alleged conduct 
grounds.  In re W.J.H., 111 S.W.3d 707, 715 (Tex. App.—Fort Worth 
2003, pet. denied).  Therefore, we are not required to address whether the 
evidence is sufficient to establish termination under section 
161.001(1)(D).  We overrule Esmeralda’s first issue.
Best Interests
        Additionally, 
she argues that termination of her parental rights would not be in the best 
interest of J.P.B.  In proceedings to terminate the parent-child 
relationship brought under section 161.001 of the family code, the petitioner 
must establish one or more of the acts or omissions enumerated under subdivision 
(1) of the statute and must also prove that termination is in the best interest 
of the child.  Id. 161.001; Richardson v. Green, 677 S.W.2d 
497, 499 (Tex. 1984); Swate v. Swate, 72 S.W.3d 763, 766 (Tex. App.-Waco 
2002, pet. denied).  Both elements must be established; termination may not 
be based solely on the best interest of the child as determined by the trier of 
fact.  Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 
1987).
        Our 
inquiry here is limited to whether, on the entire record, a factfinder could 
reasonably form a firm conviction or belief that the termination of the parent's 
parental rights would be in the best interest of the child.  In re C.H., 
89 S.W.3d 17, 28 (Tex. 2002).
        Nonexclusive 
factors that the trier of fact in a termination case may use in determining the 
best interest of the child include:
  
        (1)    the 
desires of the child;
 
        (2)    the 
emotional and physical needs of the child now and in the future;
 
        (3)    the 
emotional and physical danger to the child now and in the future;
 
        (4)    the 
parental abilities of the individuals seeking custody;
 
        (5)    the 
programs available to assist these individuals to promote the best interest of 
the child;
 
        (6)    the 
plans for the child by these individuals or by the agency seeking custody;
 
        (7)    the 
stability of the home or proposed placement;
 
        (8)    the 
acts or omissions of the parent which may indicate that the existing 
parent-child relationship is not a proper one; and
 
        (9)    any 
excuse for the acts or omissions of the parent.
  
Holley 
v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).  These factors are not 
exhaustive; some listed factors may be inapplicable to some cases; other factors 
not on the list may also be considered when appropriate.  C. H., 89 
S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be 
sufficient in a particular case to support a finding that termination is in the 
best interest of the child.  Id.  On the other hand, the 
presence of scant evidence relevant to each Holley factor will not 
support such a finding.  Id.
        A 
review of the record in this case supports that there was sufficient evidence to 
support the jury’s findings that termination of Esmeralda’s parental rights 
was in the best interest of J.P.B.  For example, Esmeralda cared for J.P.B. 
a majority of the time and the jury could have reasonably found that it was 
during this time that J.P.B. suffered twenty-one bone fractures.  
Furthermore, since he has been removed from her care, he has received no 
additional fractures.  Additionally, evidence was presented by two doctors 
who testified that they were concerned about Esmeralda’s ability to parent 
J.P.B.  There was testimony about Esmeralda’s medical condition.  
She has had several illnesses and is frequently sick.  The evidence showed 
that this affected the stability of the home for J.P.B.  Finally, Esmeralda 
testified that she did not cause the injuries to her child and neither did 
Lonnie.  She agreed that J.P.B. could not have caused the injuries himself 
and that she did not think J.P.B.’s grandparents were responsible.  In 
her testimony she stated that she believed that medical staff caused these 
injuries, despite her own testimony that she never saw medical personnel 
mistreat her child, and the fact that when he was receiving medical treatment, 
the child was usually with her or Lonnie.  She offers no additional 
explanation for how J.P.B. suffered these injuries. In fact, Dr. Abramo 
testified that in his experience with abusive parents and children of this age, 
the parents often say it was an accident or they do not know how it happened or 
do not recall how it happened.  There was evidence introduced to support 
that Esmeralda attended the psychiatric evaluation with Dr. Foster, attended 
weekly counseling sessions, and completed parenting class.  However, when 
Dr. Foster followed up on Esmeralda, he noted that she had made very little 
progress in therapy.
        The 
only evidence as to Esmeralda’s plan for the future with J.P.B. was that she 
was willing to make changes.  J.P.B.’s grandmother and grandfather both 
testified that they wanted custody of their grandson.  J.P.B.’s 
grandmother testified that she would have concerns for J.P.B.’s safety in his 
parents care.  She stated that if Lonnie and Esmeralda’s parental rights 
were terminated she would raise J.P.B. as their son, read to him, teach him, and 
eventually send him to college.  Furthermore, she testified that she would 
continue to love and bond with J.P.B.  After a review of the entire record, 
we hold that the evidence is factually sufficient to support the jury’s 
findings that termination of Esmeralda’s rights were in the best interest of 
J.P.B.
Lonnie’s 
Issue on Appeal
        Lonnie 
contends that the evidence is legally and factually insufficient to support the 
verdict terminating his parental rights.[7]  He 
argues that no evidence exists to demonstrate that he knowingly allowed J.P.B to 
be in places or with persons that could endanger his son’s physical or 
emotional well-being.
Grounds for 
Termination of Lonnie’s Parental Rights
        We 
review the evidence supporting the jury’s finding that Lonnie knowingly placed 
J.P.B. or knowingly allowed him to remain in conditions or surroundings which 
endangered his physical or emotional well-being.  See Tex. Fam. Code Ann. § 161.001(1)(D).[8]
        Reviewing 
all the evidence in the light most favorable to the jury’s answer, we find no 
evidence that Lonnie knowingly placed J.P.B in an unsafe environment, or that 
Lonnie knowingly left J.P.B. in an unsafe environment.  The record 
establishes that Lonnie made numerous visits to doctors and hospitals because he 
was concerned for his son’s well-being.  Dr. Naz even testified that 
Lonnie was a good, caring, and considerate father.  The record reveals that 
after seven visits to the doctors and/or hospital, Lonnie was given various 
diagnoses, none of which included possible child abuse.  Finally, on July 
19, 2002, on the eighth visit seeking medical assistance, Lonnie was informed 
that J.P.B. had been physically abused.  Nothing in the record supports a 
conclusion that Lonnie knew of this abuse prior to July 19, 2002.  Lonnie 
sought medical help for J.P.B. on eight separate occasions because he was 
concerned for his child’s well-being.  Lonnie argues that numerous 
medical professionals came into contact with and examined his son and did not 
detect any serious medical concerns until J.P.B.’s eighth visit, and that the 
doctors continued to reassure him that his child was fine.  Lonnie 
testified that he does not have any medical training [5:140] and that he only 
completed the tenth grade.  He argues that he is unaware how he would be 
expected to know what was wrong with his child, given that medical personnel 
could not and did not detect any physical problems with the child until his 
eighth visit.
        We 
agree.  Lonnie was rarely alone with J.P.B., and from May 23, 2002 until 
July 19, 2002, approximately eight times, Lonnie took J.P.B. to visit doctors or 
to undergo hospital exams in a persistent effort to determine the cause of 
J.P.B.’s irritable behavior and the swelling of his leg.  Lonnie was 
present at all of J.P.B.’s examinations, and Dr. Naz testified that he 
appeared to be caring, attentive, and concerned.  Lonnie has absolutely no 
medical training, and in fact, none of the physicians or nurses who examined or 
tested J.P.B. were able to reach any diagnosis of abuse during the first seven 
visits.  Furthermore, there was no evidence that Lonnie had any knowledge 
or suspicion that his wife was abusing their son.  Under the circumstances, 
we hold that there is no evidence from which a factfinder could reasonably form 
a firm belief or conviction that Lonnie knowingly placed J.P.B. or knowingly 
allowed J.P.B. to remain in conditions or surroundings which endangered his 
physical or emotional well-being.  Accordingly, we conclude that Lonnie’s 
parental rights could not be properly terminated based upon section 
161.001(1)(D) because there is no evidence to support the jury’s answer on 
these grounds.  We sustain Lonnie’s sole issue.
Conclusion
        We 
reverse the trial court’s judgment terminating the parental rights of Lonnie 
B. and we render judgment that the Texas Department of Protective and Regulatory 
Services take nothing on its claim seeking to terminate the parental rights of 
Lonnie B. to his son J.P.B.  We affirm the remainder of the trial court’s 
judgment.[9]
   
   
                                                                  PER 
CURIAM
 
  
PANEL 
B: HOLMAN, WALKER, and MCCOY, JJ.
 
DELIVERED: 
February 10, 2005


NOTES
1.  
See Tex. R. App. P. 47.4.
2.  
To protect the privacy of the parties involved in this appeal, we identify the 
child by initials only and Appellants by first names only.  See Tex. Fam. Code Ann. § 109.002(d) 
(Vernon 2002).
3.  
Effective February 1, 2004, the name of the agency changed to the Texas 
Department of Family and Protective Services.  However, for the sake of 
consistency in this case, we will continue to use TDPRS when we refer to the 
agency.
4.  
It is unclear from the record whether Esmeralda was present at every doctor’s 
or hospital visit.  Her testimony at trial reflects that she is unsure of 
specific dates J.P.B. was taken for medical treatment.  Additionally, 
Lonnie’s testimony mentions his wife being present for some of the visits to 
the doctors, but regarding other trips to the doctors, there is no mention of 
Esmeralda’s presence.
5.  
A contagious disease caused by a fungus, Candida albicans, that occurs most 
often in infants and children, characterized by small whitish eruptions on the 
mouth, throat, and tongue, and usually accompanied by fever, colic, and 
diarrhea.  The American Heritage 
Dictionary of the English Language (4th ed. 2000), available at http://dictionary.reference.com/search?q=thrush.
6.  The Eldridge due process analysis consist of three 
factors: 1) the private interest at stake; 2) the government’s interest in the 
proceeding; and 3) the risk of erroneous deprivation of parental rights.  
Then the net result is balanced against the presumption that our procedural rule 
comports with constitutional due process requirements.  Matthews v. 
Eldridge, 424 U.S. 319, 335 (1976); M.S., 115 S.W.3d at 547.
7.  Lonnie preserved his legal sufficiency issue by making a 
motion for instructed verdict; he preserved his factual sufficiency issue by 
filing a motion for new trial.
8.  The jury charge also included a question asking the jury 
whether it found that Lonnie B. engaged in conduct, or knowingly placed J.P.B. 
with persons who engaged in conduct, which endangered the child’s physical or 
emotional well-being.  The jury answered the question in Lonnie’s favor.
9.  Lonnie B. does not challenge that portion of the trial 
court’s judgment appointing Lonnie B. Sr., and Karen B. as permanent managing 
conservators of J.P.B.